Isaac R. LAWSON, Jacqueline Y. Hargraves, and Donald E. Bell, Appellants,

v.

UNITED STATES, Appellee.

Nos. 89–32, 89–44, and 89–86.

District of Columbia Court of Appeals.

Argued Feb. 13, 1991.
Decided Aug. 21, 1991.

Ralph T. Mabry, Silver Spring, Md., appointed by the court, for appellant Hargraves.

Monoranjan Bezboruah, appointed by the court, for appellant Bell.

Donnie E. Wilson, appointed by the court, submitted on the brief for appellant Lawson.

David A. Payne, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher and William J. Hochul, Washington, D.C., Asst. U.S. Attys., were on the brief, for appellee.

Before FERREN and TERRY, Associate Judges, and BELSON, Senior Judge.[*]

TERRY, Associate Judge:

After a jury trial, all three appellants were convicted of maintaining gambling premises, in violation of D.C.Code § 22–1505(b) (1989).[1] They challenge their convictions on several grounds. All three argue that the evidence was insufficient to support their convictions and that the court erroneously denied their motions for a new trial based on a claim of newly discovered evidence. Bell and Hargraves maintain in addition that the trial court erred in instructing the jury on the elements of the crime, and Bell and Lawson contend that a comment made by the prosecutor in his closing argument substantially prejudiced their rights and require reversal. We reject the contentions of Lawson and Hargraves and affirm their convictions. We agree with Bell, however, that the evidence against him was insufficient to go to the jury, and accordingly we reverse his conviction and direct the entry of a judgment of acquittal.

[*] Judge Belson was an Associate Judge of the court at the time of argument. He was commissioned as a Senior Judge on July 24, 1991.

1. The jury acquitted Hargraves of possession of cocaine, with which she was also charged. A fourth defendant, Ronald Humphries, was also convicted of maintaining gambling premises but did not appeal.

I

As a result of numerous citizen complaints regarding the activities at a house located at 2411 S Street, S.E., the police began an investigation in early October 1986. The house was a two-story single-family home in a residential neighborhood, but no one appeared to live there; instead, there was a sign hanging from the front of the house which said "D.C. Bears Athletic Club." In the course of a six-week surveillance, the police saw large numbers of people entering the house in the late evening and early morning hours and leaving around 8:00 or 9:00 a.m. Whenever anyone would knock on the front door seeking entry, the same person—described in the testimony as a man "with a salt-and-pepper beard [whose] nickname was Shorty"— would open the door and look up and down the street before permitting the visitor to enter.

As a result of their observations and investigations,[2] the police obtained a search warrant, which they executed at approximately 3:00 a.m. on November 15. Twenty to twenty-five police officers, some with their guns drawn, approached the house, and Detective Edward Curley knocked on the door. Appellant Bell opened the door in response to the knock but, upon seeing the officers,[3] immediately tried to close it. Curley testified that he and other officers "forced the door open ... rushed in and secured the three floors of the premises." They went through the living room to the dining room, where they found four or five persons, including Ronald Humphries, sitting around a table laden with cards and money. Curley arrested Humphries, searched him, and discovered $8,588 in cash in his pocket. After the house was secured, Curley found a paper bag containing more than $16,000 under Humphries' chair.

2. The police also reviewed relevant District of Columbia corporate records looking for information on the D.C. Bears, but the record does not disclose what they found.

3. It is unclear from the record how many of the officers, if any, were in uniform. Some of them were in plain clothes, but Detective Curley testified that he wore his badge pinned to an armband.

Detective Curley testified that Humphries said "it was his game and his money."

Curley and several other officers then went upstairs, where they found, in what would have been a bedroom, a felt-covered four-by-eight-foot sheet of plywood which was being used as a gaming table for cards and dice. In a closet in the same room they found numerous boxes of playing cards. The house contained no clothing of any kind, nor any beds.

In the meantime, Detective James Wells and some other officers went to the basement, where they found a bar set up and a sign posted behind it listing prices for individual drinks and half-pint bottles.[4] About eighteen persons, including appellants Hargraves and Lawson, were sitting around on chairs and couches, drinking and talking. From the bar the police recovered money, ledgers and other records, and membership cards for the D.C. Bears Athletic Club. Detective Wells forced open a padlocked storage closet and found "about twenty or thirty" bottles of liquor, a quantity of beer, mixers, cups, plates, records, and more membership cards. These cards were signed by Bob Johnson, president of the Club, and appellant Hargraves, who had signed her nickname "Peaches" in the space next to the word "Secretary." Nearby Wells found Hargraves' purse containing a key ring with a number of keys on it, including one to the padlock on the storage closet[5] and another key to the front door of the house. Detective Wells also searched Lawson and found in his pockets some dice, $504 in cash, and a key which "seemed to be the type of key that was on the key ring that belonged to Ms. Hargraves." A further search of the basement yielded a box of business cards advertising free crabs at a crab feast sponsored by "Rudie, Bob, Bleach, Sunny, and Mack" and an envelope addressed to "Mr. Rudy Lawson" at the S Street address.

At trial, in addition to Detectives Curley and Wells, the government called Officer George Taylor, who said he had gone to the house in October, about a month before the raid, in response to neighborhood complaints about parking problems created by the Club's patrons. After asking to speak with the person in charge, he discussed the parking situation with Lawson, who had come to the door and identified himself as the executive vice president of the Club. Taylor advised Lawson to "inform his patrons to start parking correctly...."

At the close of the government's case, counsel for each of the defendants moved for a judgment of acquittal. Their motions were all denied.

Counsel for Lawson recalled Detective Curley as a defense witness and questioned him about the facts supporting the search warrant in an apparent attempt to demonstrate that Lawson had no official connection with the Club. He presented no other evidence.

Willie Burton, called by Hargraves as a witness, testified that he was the general manager of the D.C. Bears amateur football team and that Bob Johnson was president of both the team and the D.C. Bears Athletic Club. He testified that Hargraves had no official capacity and only helped out the D.C. Bears organization with "minor things." He also said that he went to the Club twice a week and never saw any gambling. Hargraves herself admitted in her testimony that she had signed the membership cards, but claimed that she had done so only because the regular secretary was unavailable. She explained that she had a key to the locked closet because she was storing supplies there for a birthday party she was giving later that month.

Bell presented no evidence.

## II

Appellants Bell and Hargraves contend that the trial court improperly instructed the jury on the elements of maintaining gambling premises. In particular, they as-

---

4. Police confiscated this sign, but the government did not offer it into evidence until its existence was challenged. It was admitted into evidence during the government's rebuttal.

5. Wells did not learn that Hargraves had a key to the padlock until after he had forced open the padlocked door.

sert that the court erred in failing to instruct the jury that the government must prove that they owned, occupied, or controlled the premises. They base their argument on *Nelson v. United States*, 28 App. D.C. 32 (1906), which held that "[i]n order to warrant a conviction [of maintaining gambling premises] it is necessary that a defendant shall knowingly permit a gambling device to be set up or used for the purpose of gaming upon premises owned or occupied by him, or of which at the time of the commission of the offense he has possession or control." *Id.* at 36. Appellants' reliance on *Nelson* is misplaced because the *Nelson* court was interpreting a provision in the 1901 District of Columbia Code,[6] whereas these appellants were convicted under a very different statute.

In 1951 and 1952 a Senate Subcommittee conducted a lengthy investigation of "demoralization and corruption in law enforcement" which had allowed gambling and other vice activities "lawlessly and viciously to flourish unchecked in the Capital of the Nation." S. REP. No. 1989, 82d Cong., 2d Sess. 2 (1952). In reporting its findings, the Subcommittee endorsed a model act proposed by the American Bar Association which would have penalized anyone remotely connected with a gambling enterprise, including those who kept or stored records, transmitted gambling information, or even repaired gambling equipment. *See id.* at 23, 32–33. As a result of this investigation and an earlier one by a House Subcommittee, *see* H.R. REP. No. 3244, 81st Cong., 2d Sess. (1951), Congress in 1953 completely overhauled the gambling laws of the District of Columbia in an effort "to eliminate cumbersome provisions and loopholes." S.

REP. No. 1989, *supra* at 3. Section 866 of the 1901 Code was specifically amended to bring within its reach all those who "directly or indirectly maintain gambling premises." S. REP. No. 364, 83d Cong., 1st Sess. 7 (1953); H.R. REP. No. 514, 83d Cong., 1st Sess. 7 (1953). The 1953 amendment, with a few minor changes, is now D.C.Code § 22–1505, under which these appellants were convicted.

■ The relevant portion of section 22–1505 is subsection (b), which reads as follows:

> It shall be unlawful for any person in the District of Columbia knowingly, as owner, lessee, *agent, employee*, operator, occupant, *or otherwise*, to maintain or aid or permit the maintaining of any gambling premises. [Emphasis added.]

The reader will quickly see that this statute, unlike its predecessor which was at issue in the *Nelson* case, applies not only to owners, occupants, and persons in control, but to all persons who in any way "maintain or aid or permit the maintaining" of the premises.[7] In particular, the use of the phrase "or otherwise" shows a legislative intent to extend the reach of the statute well beyond that of the original 1901 enactment. *Cf. United States v. Wolford*, 144 U.S.App.D.C. 1, 4–6, 444 F.2d 876, 879–881 (1971) (discussing the use of "or otherwise" in federal and local kidnapping statutes). Given not only the statutory language but the legislative history, we hold that the statute may be applied to anyone who violates it in any capacity, without regard to whether he or she is the owner, occupant, or person in control of the alleged gambling premises.

---

**6.** Section 866 of the 1901 Code provided:

> Whoever, in the District, knowingly permits any gaming table, bank, or device to be set up or used for the purpose of gaming in any house, building, vessel, shed, booth, shelter, lot, or other premises *to him belonging, or by him occupied, or of which at the time he has possession or control,* shall be punished by imprisonment in the jail for not more than a year, or by a fine not exceeding $500, or both.

D.C.Code § 866 (1901), as quoted in *Nelson v. United States, supra,* 28 App.D.C. at 35 (emphasis added).

**7.** To ascertain the elements of a statutory crime, "we look to the obvious source: the statute itself." *Tibbs v. United States,* 507 A.2d 141, 143 (D.C.1986). "Moreover, in examining the statutory language, it is axiomatic that '[t]he words of the statute should be construed according to their ordinary sense and with the meaning commonly attributed to them.'" *Peoples Drug Stores, Inc. v. District of Columbia,* 470 A.2d 751, 753 (D.C.1983) (en banc) (citations omitted).

We therefore reject appellants' argument that the trial court should have instructed the jury that ownership, occupancy, or control was an element of the offense with which they were charged. That argument, based as it is on the *Nelson* case, is unacceptable because *Nelson* was effectively overruled by Congress when it rewrote the gambling statutes in 1953.

### III

We turn next to appellants' claim that the evidence was insufficient to support their convictions. Having held that ownership or control of the premises is not a necessary element of the offense, we readily conclude that the evidence was more than sufficient to prove that Lawson and Hargraves maintained or aided in maintaining the D.C. Bears Athletic Club as gambling premises.

In considering any claim of evidentiary insufficiency, this court must view all the evidence in the light most favorable to the government, keeping in mind the jury's right to assess credibility and to draw reasonable inferences from the evidence presented. *United States v. Hubbard*, 429 A.2d 1334, 1337–1338 (D.C.) (citing cases), *cert. denied*, 454 U.S. 857, 102 S.Ct. 308, 70 L.Ed.2d 153 (1981); *Byrd v. United States*, 388 A.2d 1225, 1229 (D.C.1978) (citing cases). We recognize no legal distinction between direct and circumstantial evidence. *Franey v. United States*, 382 A.2d 1019, 1023 (D.C.1978) (citing cases); *see Holland v. United States*, 348 U.S. 121, 140, 75 S.Ct. 127, 137–38, 99 L.Ed. 150 (1954). "It is only where there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt that the trial court may properly take the case from the jury." *Williams v. United States*, 357 A.2d 865, 867 (D.C.1976) (citations omitted). Viewed by these standards, the evidence abundantly established Lawson's and Hargraves' guilt.

First, as to Lawson, there was ample evidence that the S Street house was being used for gambling. Lawson had dice and more than $500 in his possession on the night he was arrested. He had earlier held himself out to Officer Taylor as the executive vice president of the Club. He received mail at the S Street address. The jury could reasonably infer that the "Rudie" who was to co-host the crab feast was Rudy (or Rudie) Lawson. We hold that the evidence of his involvement in the activities of the Club was sufficient to support his conviction.

Hargraves fares no better with her claim of insufficiency. She was on the premises when gambling was occurring. She had both a key to the storage closet where liquor and other supplies were kept and a key to the front door. She had signed membership cards with her nickname, "Peaches," in the space allotted for the secretary's signature, thereby holding herself out as the secretary of the Club. From this evidence the jury could reasonably find that she aided in the maintenance of the Club as gambling premises.

As to Bell, however, we agree that the evidence was insufficient. Even when viewed in the light most favorable to the government, the evidence showed only that Bell opened the door on one occasion and immediately tried to close it when he saw twenty to twenty-five men, some with guns drawn and one wearing a police badge on an armband. This action, without more, cannot support an inference that he was acting as the doorman that evening or even temporarily standing guard at the door. Detective Curley testified that Bell was not the regular doorman, a man with a salt-and-pepper beard known as Shorty.[8] There was no proof that any dice, cards, or other gambling paraphernalia were found in Bell's possession, and no other evidence associated him with the Club's operations. At most, the government proved that Bell was a visitor to the Club, or perhaps one of its customers. Nothing showed that he

---

**8.** Detective Wells, the government's other principal witness, did not see who opened the door and gave no other testimony that would connect Bell with the operation or maintenance of the Club.

maintained, or aided or permitted the maintaining of, the Club's premises as a gambling establishment. We conclude that, in order to convict Bell, a jury would need "to cross the bounds of permissible inference and enter the forbidden territory of conjecture and speculation." *Shelton v. United States,* 505 A.2d 767, 771 (D.C.1986). Consequently, we must reverse Bell's conviction and remand his case with directions to enter a judgment of acquittal. *See Burks v. United States,* 437 U.S. 1, 18, 98 S.Ct. 2141, 2150–51, 57 L.Ed.2d 1 (1978); *Ford v. United States,* 533 A.2d 617, 627 (D.C.1987) (en banc).

## IV

■ Appellant Lawson contends that an improper remark by the prosecutor in his closing argument was so prejudicial as to deny him a fair trial.[9] He invites our attention to the following:

> Now that leaves Mr. Lawson and Mr. Lawson's role in 2411 S Street. The Judge will instruct you, and what the government is charging Mr. Lawson with, is operating or [being] the operator of 2411 S Street on November 15, 1986. Now, first of all, what was the evidence on that point? Well, first of all, you heard Detective Wells tell you Mr. Lawson was in the basement near the bar on November 15th and that he had what appeared to be keys in his possession which Detective Wells thought fit the front door of 2411 S Street.

At this point Lawson's counsel objected and moved for a mistrial. The trial court denied the motion and gave a curative instruction to the jury.

This statement by the prosecutor referred to testimony which had been stricken during the trial. Officer Wells testified that the key taken from Lawson appeared to be the same type of key as one found in Hargraves' purse and that another officer took it upstairs to see if it would fit the lock on the front door. Counsel objected on hearsay grounds because Wells himself had *not* been present when this was done.

The court sustained the objection and instructed the jury to disregard the testimony about this key.

Whether to grant or deny a motion for a mistrial is a matter entrusted to the broad discretion of the trial court. We will reverse its decision only if it appears "unreasonable, irrational, or unfair ... or unless the situation is so extreme that failure to reverse would result in a miscarriage of justice." *Lee v. United States,* 562 A.2d 1202, 1204 (D.C.1989) (citations omitted). We perceive no abuse of discretion here. Although the prosecutor should not have mentioned the key in his summation, his lapse was minor. The comment had little relationship to the issue of innocence or guilt, and the other evidence against Lawson was strong. *See, e.g., Villacres v. United States,* 357 A.2d 423, 428 (D.C.1976). Thus we cannot say that the statement had any discernible influence on the jury in its deliberations. *See Powell v. United States,* 455 A.2d 405, 407 (D.C.1982). In addition, the trial court twice instructed the jury to disregard what the prosecutor had said, first when sustaining the objection during closing argument and again in its general charge. Without any indication to the contrary, we must presume that the jury followed these instructions. *E.g., Smith v. United States,* 315 A.2d 163, 167 (D.C.), *cert. denied,* 419 U.S. 896, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974). Considering the record as a whole, we find no basis for reversal in the denial of Lawson's motion for a mistrial.

## V

After the verdict, but before sentencing, all three appellants moved for a new trial based on a claim of newly discovered evidence. Super.Ct.Crim.R. 33. They assert that the trial court abused its discretion in denying their motion.

The newly discovered evidence involved an extrajudicial contact between Lawson and one of the jurors, Anthony Brown, which occurred during a weekend recess in

---

**9.** Appellant Bell makes additional claims of improper argument by the prosecutor, but we do not consider them, since we are reversing his conviction on other grounds.

the trial. Brown had accompanied a friend to an after-hours establishment where gambling took place. While there, he saw Lawson, and the two spoke briefly. Appellants maintain that this contact denied them the right to a trial by a panel of impartial jurors.

■ As an initial matter, we agree with the trial court that, as to Lawson, this evidence was not newly discovered. Lawson was aware of the meeting while the trial was still going on and should have informed the court about it when the court was in a position to take any necessary corrective measures. His failure to raise the issue until long after the trial had ended severely weakens his claim of prejudicial error. Regardless of that, the Supreme Court has recognized that "due process does not require a new trial every time a juror has been placed in a potentially compromising situation." *Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982). We conclude that this is one of those times when it does not.

■ When something happens which casts doubt on a juror's impartiality, the proper remedy "is a hearing in which the defendant has the opportunity to prove actual bias." *Id.* at 215, 102 S.Ct. at 945. The trial court in this case conducted just such a hearing to "determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial...." *Remmer v. United States*, 347 U.S. 227, 230, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954). After taking testimony both from Mr. Brown and other witnesses, the court found that Mr. Brown had not seen any gambling at the after-hours establishment and that his judgment was not affected. The court also credited Brown's statement that he did not mention this chance meeting to other jurors.

"Following a proper hearing, the determination of juror bias or prejudice lies particularly within the discretion of the trial court, reversible only for a clear abuse of discretion ... and the findings of fact underlying that determination are entitled to 'great deference.'" *Washington v. Washington Hospital Center*, 579 A.2d 177, 185

(D.C.1990) (citation omitted). Our review of the trial court's decision is limited to determining whether that court abused its discretion. *Letsinger v. United States*, 402 A.2d 411, 417–418 (D.C.1979). We see no such abuse on the record before us. We accept the court's factual findings because they are not plainly wrong or unsupported by the evidence, *see* D.C.Code § 17–305(a) (1989), and we are fully satisfied that the hearing which the court held was sufficient to meet the demands of due process, *i.e.*, sufficient to ascertain whether there was any prejudice resulting from the encounter between Lawson and the juror. *See Waller v. United States*, 389 A.2d 801, 807 (D.C.1978), *cert. denied*, 446 U.S. 901, 100 S.Ct. 1824, 64 L.Ed.2d 253 (1980). We hold accordingly that the trial court did not err in denying appellants' motions for new trial.

### VI

The convictions of appellants Lawson and Hargraves are affirmed. The conviction of appellant Bell is reversed because the evidence against him was insufficient to prove him guilty. Bell's case is remanded with directions to enter a judgment of acquittal.

*Affirmed as to Lawson and Hargraves, reversed and remanded as to Bell.*