# District of Columbia
# Court of Appeals

**No. 14-CF-118**

RICHARD WALKER WILLIAMS,

Appellant,

v.

UNITED STATES,

Appellee.



FILED

JUL -7 2016

DISTRICT OF COLUMBIA
COURT OF APPEALS

**CF1-19666-10**

On Appeal from the Superior Court of the District of Columbia
Criminal Division

BEFORE: GLICKMAN and THOMPSON, *Associate Judges*; and NEBEKER, *Senior Judge*.

## A M E N D E D   J U D G M E N T[*]

This case came to be heard on the transcript of record and the briefs filed, and was argued by counsel. On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the appellant's convictions are affirmed.

For the Court:

JULIO A. CASTILLO
Clerk of the Court

Dated: July 7, 2016.

Opinion by Senior Judge Frank Q. Nebeker.

---

[*] This amended decision is being reissued pursuant to and concurrently with an order of the court granting appellee's motion to amend.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 14-CF-118

RICHARD WALKER WILLIAMS, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF1-19666-10)

(Hon. Robert E. Morin, Trial Judge)

(Argued November 5, 2015      Decided April 28, 2016)
Amended July 7, 2016[1]

*Debra Soltis*, with whom *Paul Y. Kiyonaga* was on the brief, for appellant.

*Christopher R. Howland*, Assistant United States Attorney, with whom *Vincent H. Cohen, Jr.*, Acting United States Attorney at the time, and *Elizabeth Trosman, John P. Mannarino*, and *Michael Liebman*, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and THOMPSON, *Associate Judges*, and NEBEKER, *Senior Judge*.

---

[1] Appellee's motion to amend the opinion is granted with regard to the second sentence in the third paragraph in section II.A of the opinion. This decision upon reissuance is otherwise unchanged.

NEBEKER, *Senior Judge*: This appeal arises from a fatal stabbing in the Southeast quadrant of the District of Columbia. Following a jury trial, appellant Richard Walker Williams was convicted of one count of second-degree murder while armed as a lesser included offense, one count of carrying a dangerous weapon ("CDW") having previously been convicted of a felony,[2] and two counts of offense committed during release ("OCDR").[3] Appellant challenges his convictions, arguing that the trial court erred in finding him competent for self-representation and in failing to re-examine *sua sponte* the issue of appellant's competency during trial. Appellant also argues that the trial court erred in admitting evidence of his prior felony conviction and his release status. For the reasons stated below, we affirm appellant's convictions.

## I.

## A.

On August 27, 2010, Sean West was fatally stabbed at a Shell Station after being seen engaging in a fight with appellant. On March 1, 2011, appellant was

---

[2] D.C. Code § 22-4504 (a)(1) (2012 Repl.).

[3] D.C. Code § 23-1328 (a)(2) (2012 Repl.).

indicted for multiple felony offenses. After lengthy pretrial proceedings, which included a competency hearing, appellant requested and was allowed to represent himself at trial with the assistance of standby counsel.

Appellant was initially represented by Anthony Matthews who filed a motion to withdraw based in part on appellant's belief that Mr. Matthews was ineffective during the preliminary hearings. Appellant claimed that Mr. Matthews had altered the preliminary hearings transcripts. The trial court granted a continuance to allow appellant to retain new counsel. On July 29, 2011, appellant's second counsel, Heather Pinckney, informed the court that she had productive discussion with appellant and that they were negotiating with the government. Nevertheless, on January 20, 2012, Ms. Pinckney filed a motion to withdraw, citing an "extreme lack of trust . . . that extends both from client to counsel as well as counsel to client."[4] The court granted a continuance to see if appellant and Ms. Pinckney could resolve their differences. Ultimately, Ms.

---

[4] At the motions hearing, appellant accused the government of tampering with the evidence; more specifically, he claimed that one of the police forms, the PD-119, had been altered. Appellant stated that he did not want Ms. Pinckney to withdraw until after he could compare the government's PD-119 form with his copy to make sure "on record" they were the same. Ms. Pinckney informed the court that the only difference was that the witnesses' names had been redacted on appellant's copy.

Pinckney requested that the court again consider her motion to withdraw. The court granted Ms. Pinckney's motion to withdraw and asked another attorney, Elliot Queen, to consult with appellant about potential representation. Finally, Tom Heslep became appellant's final and standby counsel. Mr. Heslep, although he thought there were competency issues, stated that appellant could easily pass the *Dusky*[5] competency test because appellant "[knew] who does what, when, and where in the trial." Appellant denied being paranoid and asked to represent himself.[6]

On November 19, 2012, the trial court held a suppression motions hearing. Mr. Heslep argued a motion to suppress identification, which the court conditionally denied. Appellant argued motions *pro se* alleging multiple instances of prosecutorial misconduct. During his argument, appellant conceded that he went by "Gemini," the nickname of the person two eyewitnesses had seen fighting with Mr. West prior to the stabbing. Appellant admitted that he fought with Mr. West, who died shortly after their altercation. He also admitted to being

---

[5] *Dusky v. United States*, 362 U.S. 402 (1960).

[6] Appellant sent the court a letter accusing the government of sending Department of Corrections ("DOC") personnel to ask him irrational questions to get yes-or-no answers from him. The government said that it was not aware of any such interactions.

intoxicated and "a little fuzzy on what took place." During this hearing, appellant accused the government of knowingly allowing a witness to give false testimony at a preliminary hearing and of providing altered PD-119 forms to him, reiterating his basic point: appellant was "being framed by this prosecutor."[7] At this point, Mr. Heslep requested a mental evaluation. The court explained to appellant that, to represent himself, appellant needed to consult with a doctor.

**B.**

Dr. Elizabeth Teegarden, a psychologist at St. Elizabeth Hospital, conducted a 40-minute psychiatric screening of appellant and prepared a written report ("Teegarden report"). Dr. Teegarden noted that appellant had not experienced hallucination or phobias and explained that appellant's unusual thinking surfaced only when he began discussing his legal situation. She also noted that appellant understood the roles of various courtroom officials, the function of a jury, the plea bargaining process, his rights as a defendant, and the adversarial nature of legal

---

[7] Appellant also claimed the security video from the gas station that his counsel had shown him was different from the one shown in court. Appellant claimed that DOC officers were watching him 24 hours a day and speaking in "coded conversations." When the government stated that the video showed appellant holding what appeared to be a silver knife, appellant demanded to see the video. Presented with the footage, appellant stated it could have been a silver truck passing by.

proceedings. Dr. Teegarden, however, was unable to conclude whether appellant was "unwilling," as opposed to "unable," to participate in court proceedings. She noted that she could not discern whether appellant's behavior was "the result of volitional characterological traits, mental illness, substance abuse, malingering, or some combination of these factors." Given these findings, the court ordered appellant to be committed to St. Elizabeths Hospital for a full evaluation.

Appellant was admitted to St. Elizabeths on November 26, 2012. Appellant refused to participate in a formal competency evaluation. Based on other observations, however, the staff at St. Elizabeths concluded that appellant was competent to proceed with his case and documented their findings in a report ("St. Elizabeths Report"). The report noted that during his time at the hospital, he was involved in numerous aggressive incidents that were unrelated to any sort of mental illness and were instead under his volitional control. Further, the report noted appellant's overall behavior was "inconsistent and atypical of an individual who has a psychotic disorder." Furthermore, appellant's "clinical presentation [was] not consistent with an individual who either has problems with cognition or who meets criteria for a major mental illness . . . that would interfere with his ability to participate in the court proceedings." Regarding appellant's "assertion that the legal system is conspiring against him," the report explained that it "likely

reflects cynicism or antisocial attitudes rather than paranoia or other inability to think rationally." The St. Elizabeths Report listed appellant's diagnoses as "Malingering (Psychosis), Alcohol Dependence, In a Controlled Environment, Phencyclidine Abuse, and Personality Disorder Not Otherwise Specified with Antisocial and Narcissistic Personality Traits."

The trial court held a competency hearing on April 5, 2013. Dr. Michele Godwin, a psychologist at St. Elizabeths Hospital, testified at the hearing for the government as an expert in the diagnosis and treatment of mental disease and illness. Dr. Godwin had interacted with appellant almost daily. Based on her consultation and review of appellant's records, Dr. Godwin diagnosed appellant with malingering, "the feigning and exaggeration of psychiatric condition," as well as alcohol dependence and phencyclidine abuse. In Dr. Godwin's opinion, appellant did "not have a major mental illness that would impede upon his ability to understand what is happening in court." Dr. Godwin opined that appellant could understand the charges, the role of the prosecutor, the judge, his attorney, and the jury. Dr. Godwin further opined that appellant could maintain control in the courtroom "if he [chose] to" and that he could assist his counsel in evaluating the testimony of witnesses the government called to testify against him.

Regarding paranoia disorder, Dr. Godwin explained that people with this disorder think that everyone's motives and intentions are harmful and that people are out to get them consistently. Such a feeling of paranoia would be "pervasive and persistent" and would apply to both important and non-important issues. Appellant's behavior, however, did not fit into this category. Dr. Godwin explained that appellant's distrust related only to his legal proceedings, and appellant seemed to "turn[] it off and on . . . like a light switch," indicating that appellant's issue was "not pervasive enough" to be characterized as a personality disorder.

Further, Dr. Godwin did not observe any "delusional type of thinking." Appellant had no structural brain damage or history of psychosis. Appellant was rational in his ability to understand and weigh his options. Nothing "impact[ed] [his] ability to reasonably look at evidence and be able to cooperate with counsel." Dr. Godwin also explained that even a person diagnosed with full-blown antisocial or narcissistic disorder could still be competent to stand trial.

Lastly, in Dr. Godwin's opinion, appellant was competent to represent himself without counsel. More specifically, she stated that "there is nothing that would prevent [appellant from] being able to talk about his case rationally, to

present evidence should he choose to." Dr. Godwin found that although appellant was a "strong-willed and purposeful individual," he was "able to understand rules and . . . when things are to his advantage and when they are at his disadvantage." Dr. Godwin stated that appellant had "a capacity to understand what would be the limitations of self-representation and what would be the advantages." Accordingly, Dr. Godwin concluded that "[t]here's nothing that would interfere with that process of him being able to [represent himself] from a psychological perspective."

Following Dr. Godwin's testimony, the trial court found that appellant was "articulate" and "intelligent." Appellant did not "strike [the court] as an individual suffering from significant mental illness." The court found there were "aspects of [appellant] that appear to be malingering." More specifically, the court found that "some, if not all, of [appellant's] symptoms [were] being created strategically by [him], who . . . wants to be heard and present a defense . . . which other attorneys heretofore representing him have disagreed with." Noting that the record contained conflicting evidence, the trial court ultimately concluded that appellant was competent to stand trial.

The court then gave appellant an opportunity to confer with Mr. Heslep regarding the issue of self-representation. After this discussion, Mr. Heslep indicated that appellant still wished to represent himself and that, in Mr. Heslep's opinion, appellant would be "able to work with [him] in terms of technical legal questions." The court went on to make a separate finding that appellant was competent to represent himself at trial for the following reasons: (1) appellant had filed motions on his own behalf, (2) he had legal theories and appeared to understand the law and could assist standby counsel, and (3) there was "nothing in this record that caused the court to hesitate or pause about any questions of competency concerning his self-representation that somehow [was] different than the [c]ourt's conclusion of his competency in general."

Appellant affirmed that he wished to represent himself at trial after confirming that he understood the charges against him, legal standards, the advantages and disadvantages of self-representation, that he would be waiving certain rights. The trial court concluded that appellant had freely and voluntarily waived his right to an attorney and that his decision was knowing and intentional. Mr. Heslep remained appellant's attorney as standby counsel.

**C.**

With respect to the CDW charge, the government argued that appellant's prior felony conviction was an element of the offense and that appellant could not waive part of the jury trial without the government's consent, which the government clearly refused. The trial court agreed, citing *Goodall v. United States*, 686 A.2d 178 (D.C. 1996). For the OCDR charges, the court noted that appellant's release status was "a sentencing enhancement" and was often litigated after trial. The court explained that it understood defense counsel to be requesting that the OCDR charges be severed from the remaining charges and to waive a jury on those counts. The government indicated that, assuming the court granted severance, it would not oppose a bench trial on the OCDR counts. Nevertheless, after discussing with Mr. Heslep, appellant indicated that he would not ask for severance because, although he was "bothered by the felony," he "was not bothered too much by" the evidence of his release status. Mr. Heslep, after discussing with appellant, offered to stipulate. Accordingly, the court allowed the government to mention appellant's prior felony conviction and release status during opening statement, but "not to highlight it" or focus on the prior conviction during its case in chief. The court required the government to introduce the stipulations last and explained that the government could not focus on that aspect

during closing argument. During trial, the court issued a limiting instruction as to the proper use of the prior conviction and appellant's release status immediately following the stipulations.

Following the trial, the jury convicted him of the lesser-included offense of second-degree murder while armed, as well as CDW and the two OCDR charges. On January 31, 2014, the trial court imposed concurrent sentences of 384 months of incarceration for second-degree murder and 60 months for CDW. The court also imposed a consecutive term of 36 months for OCDR.[8] This appeal followed.

## II.

## A.

Appellant argues, through present appellate counsel, that the trial court erred in finding him competent for self-representation because the court failed to make an individualized assessment of his mental capacities and disregarded substantial evidence of his mental deficiencies. He further argues that the trial court abused its

---

[8] At sentencing, the trial court vacated the OCDR conviction related to the CDW count.

discretion by failing to re-examine *sua sponte* the issue of his competency despite a number of "red flags" during trial and sentencing. We find both arguments unpersuasive and unsupported by the record.

"Competency determinations are within the trial judge's discretion and are afforded deference." *Howard v. United States*, 954 A.2d 415, 419 (D.C. 2008) (citation omitted). Therefore, we review the trial court's competency determination, which is "largely a factual determination," for "clear error." *Hooker v. United States*, 70 A.3d 1197, 1203 (D.C. 2013) (internal citations and quotation marks omitted). "A finding of competency will not be set aside upon review unless it is clearly arbitrary or erroneous." *Howard*, *supra*, 954 A.2d at 419 (citation and internal quotation marks omitted); *see also*; *Hargraves v. United States*, 62 A.3d 107, 111 (D.C. 2013) ("At [a competency] hearing, the defendant is presumed to be competent; the party asserting his incompetence has the burden of proving it by a preponderance of the evidence.").

In determining whether a defendant is competent to stand trial, the trial court must decide whether a defendant has "a rational [and] factual understanding of the proceedings against him" and whether he "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding." *Dusky v.*

*United States*, 362 U.S. 402 (1960) (per curiam) (establishing the two-part test for competency to stand trial); *see also Drope v. Missouri*, 420 U.S. 162, 171 (1975). In determining a defendant's competency for self-representation, the trial court may need to go beyond the standard in *Dusky*. *Indiana v. Edwards*, 554 U.S. 164 (2008). In that case, the Court explained that under certain circumstances a defendant "may well be able to satisfy *Dusky*[,]" but at the same time he or she does not possess the necessary mental capacities to "carry out the basic tasks needed to present his [or her] own defense without the help of counsel." *Id.* at 175. The Court, however, did not form a test for determining a defendant's competency for self-representation. Instead, the Court deferred to the trial court's judgment and held that a trial judge, who had presided over the defendant's competency proceedings and trial, would "prove best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant." *Id.* at 177.

Here, after reviewing the record, we find no errors by the trial court, as the court was meticulous at each stage of appellant's competency proceedings. The court's competency findings were supported by ample evidence, namely Dr. Godwin's testimony and two reports written by medical experts who had interacted with appellant. As discussed in Part II.B, *supra*, at counsel's suggestion,

appellant's mental competency was examined not once, but twice. Dr. Teegarden concluded that appellant was able to understand the "nature and object" of the proceedings against him. *See Drope*, *supra*, 420 U.S. at 171 (stating that "a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial."). Next, to determine whether appellant was "unwilling" or "unable" to participate in court proceedings, the trial court ordered appellant to be committed to St. Elizabeth Hospital where his behavior was closely observed and analyzed for two months. The St. Elizabeth report concluded that appellant's behavior was not consistent with a person suffering cognitive problems or a major mental illness "that would interfere with his ability to participate in the court proceedings." The Teegarden and St. Elizabeth reports confirmed that appellant had the necessary understanding of the case against him and was able to participate in the legal proceedings.

Lastly, and most importantly, the trial court held a competency hearing before trial. At this hearing, the court heard from Dr. Godwin, a qualified expert who had daily interactions with appellant. Dr. Godwin was a clinical administrator psychologist at St. Elizabeth Hospital during appellant's time there. Her expert opinion was based on her observations of appellant as well as her consultation and

review of his records. Dr. Godwin's opinion confirmed the findings in the St. Elizabeth report that appellant did not suffer from a major mental illness that would "impede upon his ability to understand what is happening in court." She also concluded that appellant could maintain control in the courtroom "if he [chose] to" and that he could assist his counsel in evaluating the testimony of witnesses against him. Finally, Dr. Godwin concluded that there was nothing that would prevent appellant from representing himself competently. Appellant's standby counsel cross-examined Dr. Godwin extensively. Standby counsel later informed the court that he believed appellant would be able to work with him on technical legal questions.

After considering appellant's medical reports and Dr. Godwin's testimony, the trial court found "on balance" the evidence demonstrated that appellant was competent to stand trial. Appellant did not "strike [the court] as an individual suffering from significant mental illness." While recognizing the questionable nature of appellant's defense tactics, the court considered appellant an "intelligent individual," who was able to confront evidence against him and present a defense to that evidence. The court credited Dr. Godwin's testimony in finding that "some,

if not all, of these symptoms are being created strategically by Mr. Williams," and that there were aspects of appellant that the court found to be malingering.[9]

With regards to self-representation, the court announced that it needed to make a separate finding as to appellant's competency. The court noted that appellant (1) was able to file motions, (2) had legal theories, and (3) appeared to understand the law. Accordingly, the court found appellant competent to represent himself at trial. The court then engaged appellant in a lengthy formal inquiry regarding his understanding of the charges he was facing, possible sentence, and why he wished to represent himself. Appellant had no trouble understanding the court's questions. His answers were clear and articulate. Appellant was able to describe two defense theories that he planned to present at trial. After the court informed appellant of the rules of trial, the possible disadvantages of self-representation, appellant stated that he understood and still wished to waive his right to counsel. Mr. Heslep remained as appellant's standby counsel throughout trial and sentencing.

---

[9] Dr. Godwin explained that appellant's paranoia related only to his legal proceedings, and appellant seemed to "turn[] it off and on . . . like a light switch," indicating that appellant's issue was "not pervasive enough" to be characterized as a personality disorder.

On this record, we are satisfied that the trial judge, who had had several interactions with appellant throughout pre-trial proceedings, was in the best position here to make "fine-tuned" and "individualized" assessments of appellant's mental capacities. *Edwards*, *supra*, 554 U.S. at 177; *see also Gorbey v. United States*, 54 A.3d 668 (D.C. 2012) ("We accord great deference to the trial court's inferences from its personal observations of, and conversations with, the defendant.") (citing *Howard v. United States*, 954 A.2d 415, 422 (D.C. 2008)). Not only did the trial court make two separate competency findings as suggested in *Edwards*, the court's determination of appellant's competency for self-representation went beyond its initial findings regarding appellant's competency to stand trial. The trial court noted that appellant had filed and argued his *pro se* motions and was able to form his defense theories, all of which demonstrated appellant's knowledge of the law and his ability to participate in the legal proceedings. Accordingly, we find no errors, let alone "clear error."

Appellant also argues that the trial court abused its discretion in failing to re-examine *sua sponte* appellant's competency for self-representation during trial and at sentencing. To support this argument, appellant cites a number of "red flags," which he claims should have raised a substantial doubt about his ability to carry out the basic tasks needed to present a defense without counsel's assistance. These

"red flags" include (1) appellant's attempt at trial to prove a conspiracy against him by repeatedly accusing the government of tampering with the evidence and (2) statements made by him, his standby counsel, and the prosecutor during sentencing.[10]   Nevertheless, our review of the record persuades us that these alleged "red flags," standing alone or collectively, did not raise a "substantial doubt" about appellant's mental abilities to trigger the trial court's "constitutional duty" to order a competency hearing *sua sponte*. *See Phenis v. United States*, 909 A.2d 138, 152 (D.C. 2006) ("Where there is evidence raising a substantial doubt as to a defendant's competency to stand trial, the trial judge is under a constitutional duty to order a hearing *sua sponte*.") (citation omitted).

---

[10] Appellant cites his statements at sentencing:  "This case really is about the coming back of Christ.  And like I wasn't going to do this because I don't want y'all to think that I'm crazy because I am not.  I am the saint for Jesus Christ."  We are not persuaded that these statements should have triggered substantial doubt about appellant's mental capacities.  Quite the contrary, they suggest that appellant understood what was at stake and attempted to argue his innocence to the court one last time.

Appellant also cites Mr. Heslep's statements in his Memorandum in Aid of Sentencing and the prosecutor's statements referring to appellant's mental health issues as "the elephant in the room."  We find these statements insufficient as well.  Mr. Heslep, though he stated that appellant's "traits severely handicapped his conduct of the case," focused his discussion on how appellant's condition could have affected him at the time of the crime, not during trial.  The prosecutor's statement was a mere comment on appellant's behavior.

Appellant's reliance on *Gorbey v. United States* is misplaced. In that case, Mr. Gorbey, armed with multiple weapons, was arrested while on his way to the United States Supreme Court with the intent to meet Chief Justice John Roberts. *Gorbey*, *supra*, 54 A.3d at 675. He was charged and convicted of multiple weaponry offenses. Like appellant here, Mr. Gorbey requested and was allowed to represent himself with the assistance of a standby counsel. Mr. Gorbey's mental abilities, however, were never examined by a medical expert nor did he have a competency hearing. On appeal, Mr. Gorbey argued that the trial court abused its discretion in failing to *sua sponte* order an evaluation of his mental abilities. *Id.* at 677 (remand on different grounds). Mr. Gorbey asserted similar "red flags," such as his efforts to prove that the government conspired against him, his questionable defense theory, as well as comments made by his standby counsel and prosecutors. The *Gorbey* court, however, found that despite Mr. Gorbey's troubling behavior, he nevertheless knew what was going on during trial as evidenced by his cooperation with standby counsel and his numerous oral and written *pro se* motions in support of his defense theory. *Id.* at 688, 693. The court held that the trial court did not err because, despite a number of "red flags," appellant "knew what he was doing and . . . and his choice was made with eyes open." *Id.* at 693 (citation and internal quotation marks omitted).

We reach the same conclusion here. Appellant benefited from the same "hybrid representation" as Mr. Gorbey did.[11] Appellant "knew what he was doing," as evidenced by his performance at trial including (1) cross-examining witnesses effectively and responding to evidence against him, (2) highlighting inconsistencies in the government's witnesses' testimony and police reports in his closing statements, (3) emphasizing gaps in the video surveillance evidence, and (4) presenting his own version of the altercation leading up to the stabbing. All in all, appellant exhibited no trouble in "carry[ing] out the basic tasks needed to present his own defense without the help of counsel." *Edwards*, *supra*, 554 U.S. at 175-76. Furthermore, unlike Mr. Gorbey, appellant's mental capacities were carefully evaluated prior to trial by mental health experts. Most importantly, he had a competency hearing, where the trial court heard from both Dr. Godwin and appellant's counsel confirming that appellant was competent for self-representation. Therefore, on this record, we are satisfied that the trial court did not err as we see no evidence that would raise a "substantial doubt" about appellant's competency. *See Gorbey*, *supra*, 54 A.2d at 688.

---

[11] *Ali v. United States*, 581 A.2d 368, 379 (D.C. 1990) ("The Supreme Court has held that while a defendant does not have a constitutional right to such 'hybrid' representation, the trial court may permit this arrangement in its own discretion.") (citing *McKaskle v. Wiggins*, 465 U.S. 168, 183 (1984)).

**B.**

Appellant argues that the trial court committed reversible error by allowing the government to introduce two evidentiary stipulations at trial regarding his prior felony conviction and release status. As appellant failed to preserve the issue at trial, we review for plain error. "A 'plain error' is identified by three qualities: first, there must be an error; second, this error must be plain in the sense that it must be obvious to the trial judge; and third, the error must affect substantial rights." *Wheeler v. United States*, 930 A.2d 232, 242 (D.C. 2007) (citing *United States v. Olano*, 507 U.S. 725, 732-34 (1993)). We will reverse based on a plain error only in " 'particularly egregious' situations," where such error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Id.* (internal citations and quotation marks omitted). For the reasons stated below, we find that the trial court erred in allowing the jury to hear stipulations of appellant's prior felony conviction and release status. However, we find that reversal is not warranted.

*Eady v. United States*, 44 A.3d 257 (D.C. 2012) is instructive here. In that case, the appellant appealed his convictions for carrying a pistol without a license

("CPWL"),[12] possession of an unregistered firearm,[13] and possession of ammunition.[14] *Id*. at 258. The appellant's convictions were also subject to sentencing enhancement because he had a prior felony conviction and he had committed the charged offenses while on release for another criminal case. [15] *Id*. The trial court in *Eady* read the unredacted indictment to the jury, which stated that the appellant had a prior felony conviction and had committed the charged offenses while on release. The prosecutor was allowed to argue that the appellant had committed a prior felony and had been on release. The trial court also provided the jury with written copies of the appellant's stipulations regarding his other crimes. *Id*. Relying on *Apprendi v. New Jersey*,[16] we held that the trial court plainly erred in subjecting the jury to "unnecessar[y] and prejudicial[]" evidence regarding the

---

[12] D.C. Code § 22-4504 (a) (2001). Under § 22-4504, the CPWL charge is punishable at three different levels of severity. The lowest penalty is imprisonment up to one year and a fine up to $1,000. D.C. Code §§ 22-4504 (a), -4515. However, if the defendant has previously been convicted of the same offense or of a felony, this provision allows for enhanced sentence up to ten years of imprisonment and a fine up to $10,000. D.C. Code § 22-4504 (a)(2).

[13] D.C. Code § 7-2502.01 (2001).

[14] D.C. Code § 7-2506.01 (3) (2001).

[15] D.C. Code §§ 22-4504 (a)(2) (2001), 23-1328 (a)(1) (2001).

[16] The Supreme Court held that "[o]*ther than the fact of a prior conviction*, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000) (emphasis added).

appellant's prior felony conviction. *Id.* at 258, 261. With regards to OCDR pursuant to D.C. Code § 23-1328, the *Eady* court re-affirmed that this section does not create a separate offense, but is a sentencing enhancement. *Id.* at 261-62 (citing *Tansimore v. United States*, 355 A.2d 799, 803 (D.C. 1976)). However, the question of whether *Apprendi* would require defendant's release status to be submitted to and determined by the jury remained unanswered. *Id.* at 262 (declining to visit this issue because the appellant agreed to stipulate that he was on release for another criminal case at the time of the charged offenses). We then held that this stipulation made it "unnecessary to advise the jury of a prejudicial fact [of the appellant's release status] that played no part in the jury's consideration of the charged crimes, and was relevant only to sentencing." *Id*. at 263 (citing *Old Chief v. United States*, 519 U.S. 172, 191-92 (1997)). Therefore, we held that it was a plain error to admit evidence of the appellant's release status.

Similar to *Eady*, appellant here was subject to the same sentencing enhancement pursuant § 22-4504 (a)(2) and § 23-1328. Appellant stipulated to both the prior felony conviction and his release status, and the trial court allowed the government to read these stipulations to the jury. As decisions rendered by previous panels of this court are binding on us, *see M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971), we hold that the trial court here plainly erred in allowing the jury

to hear "unnecessar[y] and prejudicial[]" evidentiary stipulations concerning appellant's other crimes. *Eady*, *supra*, 44 A.3d at 265 (citing *Drew v. United States*, 331 F.2d 85, 89-90 (D.C. Cir. 1964); *Johnson v. United States*, 683 A.2d 1087, 092 (D.C. 1996) (en banc)).

The inquiry now turns to whether this erroneously admitted evidence affected appellant's substantial rights, and "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *Wheeler*, *supra*, 930 A.2d at 242. On this record, the answer is no because the trial court took appropriate actions in minimizing the potential prejudicial effects of the evidence and the government's case was supported by credible evidence. *See Eady*, *supra*, 44 A.3d at 266-71 (holding the trial court's decision to allow stipulations of other crimes evidence was plain error affecting the appellant's substantial rights and the integrity of the judicial proceedings because the government's case was weak as it hinged entirely on the credibility of a single witness without any corroborating evidence).

Here, the government's evidence consisted of testimony of two eyewitnesses and corroborating video evidence. Eyewitnesses testified to seeing the fight between appellant and Mr. West. Michael Williams, who knew both men, tried to

break up the fight and saw that appellant had a three-inch knife with him at the time. Michael tried to calm appellant and told him to "let it go," and appellant responded, "I can't let him get away with it" and that Mr. West had cut him before and showed Michael his two scars. Michael testified that appellant followed Mr. West across the street and appellant seemed to punch Mr. West while they were fighting across the street. Eric Landis, the second eyewitness who also knew appellant and Mr. West, testified to seeing the fight and then appellant cross the street. Mr. Landis then saw appellant lunge towards Mr. West. He saw Mr. West bend over, grab his midsection and run back to the gas station. The government introduced the gas station's surveillance video depicting appellant and Mr. West in a fight and appellant holding a knife. The video evidence also showed Mr. West walking across the street and appellant following shortly after. It then showed Mr. West running back across the street towards the station with blood covering his shirt.

As to the stipulations, after the government read the stipulations, the trial court immediately issued a limiting instruction to the jury:

> With regard to both those matters, any prior conviction and his status as a person on release, you are not to use those matters as proof that that defendant carried or possessed a dangerous weapon or conclude because he has a prior conviction, he is guilty of the offenses here. . .

. You may not speculate as to the nature of the prior conviction. And again, this evidence is admitted only as evidence of the prior conviction and this status on release and you cannot consider those matters in deciding whether or not he carried the dangerous weapon.

On this record, we have two credible eyewitnesses who saw the fight between appellant and Mr. West as well as video evidence corroborating the witnesses' testimony.[17] The trial court issued limiting instructions preventing the jury from using these stipulations as evidence of guilt. We must presume that the jury followed the instructions. *Lawson v. United States*, 596 A.2d 504, 510 (D.C. 1991). Furthermore, the jury was never informed of the details of appellant's other crimes that could potentially provoke prejudice in the jury. *See United States v. Coleman*, 552 F.3d 853, 856–57 (D.C. Cir. 2009) (reversing a conviction for possession of a firearm by an ex-felon because the trial court improperly read the unredacted indictment to the jury and thereby informed the jury that defendant had previously been convicted of robbery with a deadly weapon). Accordingly, we hold that appellant was not prejudiced by the error as the case against appellant

---

[17] At a pretrial motions hearing, appellant conceded that he went by "Gemini," the nickname of the person two eyewitnesses had seen fighting with Mr. West prior to the stabbing. Appellant admitted that he fought with Mr. West, who died shortly after their altercation. He also admitted to being intoxicated and "a little fuzzy on what took place."

was strong and the trial court took cautionary steps in instructing the jury. Therefore, reversal is not warranted.

## III.

For the foregoing reasons, we affirm appellant's convictions.

*So ordered.*